# United States Court of Appeals
## For the First Circuit

No. 10-1026

NITZA I. COLÓN-FONTÁNEZ,

Plaintiff, Appellant,

v.

MUNICIPALITY OF SAN JUAN,

Defendant, Appellee,

JANE DOE; JOHN DOE; CORPORATION X, Y, Z,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Siler,[*] Circuit Judges.

Vilma M. Dapena-Rodríguez, for appellant.
Angel A. Valencia-Aponte, with whom Cristina S. Belaval-Burger
and Martínez Odell & Calabria, were on brief for appellee.

October 12, 2011

[*]  Of the Sixth Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**. Plaintiff-Appellant Nitza I. Colón-Fontánez ("Colón") appeals the district court's award of summary judgment to her employer, the Municipality of San Juan (the "Municipality"), on her claims of disability discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and the Rehabilitation Act, 29 U.S.C. § 701 et seq., and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000 et seq. We conclude that summary judgment was properly granted as to each of Colón's claims. We further hold that the district court committed no reversible error when it (1) refused to consider evidence for which no corresponding English translation was provided to or properly filed with the court; (2) admitted summary charts prepared by a paralegal employed by the defendant-appellees' law firm in this case; and (3) dismissed Colón's alleged equal protection claim sua sponte.[1] We therefore affirm the decision of the district court.

## I.  Background

### A.  Colón's Employment at the Municipality

Colón first began working for the Municipality in 1989 as a temporary worker. In 1992, the Municipality reclassified Colón as a regular employee. Colón's position with the Municipality was

---

[1]  Although Colón references an equal protection claim in her amended complaint, she does not list it in the complaint's causes of action or provide any legal or factual argument supporting it. We address both the substance and merits of this alleged claim infra, as it is an issue raised on appeal.

reclassified multiple times in subsequent years. Of significance to this appeal is her reclassification on June 30, 2006, when the Municipality appointed Colón as an "Auction Officer," which became effective retroactively on May 1, 2005.

Colón's position as an Auction Officer required that she, among other duties, analyze bid recommendations, prepare bid notices, contracts, and award notices, attend the openings and holdings of bids, submit bid proposals for recommendations, evaluate recommendations and submit them to the Bid Board, and direct administrative work concerning the bids and proposals among various departments. To perform these duties, the Auction Officer was required to be physically present in the Auction Department. Additionally, auction papers could not be removed from the auction office premises.

As an Auction Officer, Colón worked in the Auction Department located in the Municipal Tower building in San Juan, Puerto Rico.[2] The Municipal Tower building is accessible from a multi-floor parking building that is adjacent to the Municipal Tower building. The Municipality pays rent for approximately four hundred parking spaces for its employees. The Municipality pays $40.00 and the employee pays $20.00 for each rental of a parking

---

[2] Employee positions and department titles are not consistently translated in the record. To maintain uniformity, we refer to Colón's department as the Auction Department and to her title at the time she requested a parking spot as Auction Officer.

space.  The Municipal Tower itself offers approximately seventy-five parking spaces.

As an Auction Officer, Colón was under the supervision of several Municipality employees, all holding different managerial positions and varying degrees of authority over Colón during the years relevant to this dispute.  These supervisors included José Alicea Rivera ("Alicea"), Municipal Secretary and President of the Municipality's Auction Board; Ivonne Rodríguez ("Rodríguez"), Director for the Purchases and Bids Department and one of Colón's main supervisors during the relevant period; Maria Marcano ("Marcano"), Rodríguez's first line supervisor in the Auction Department; Julia Lanzó ("Lanzó"), manager of the Auction Department; James Delgado ("Delgado"), an auction official who was second in command in the Auction Department and who served as acting manager if Lanzó was not present; and José Rivera-Hernández ("Rivera"), who served as the Special Assistant of the Municipal Secretary and who verified that all persons parked in the Municipal Tower parking lot were authorized to do so.

Generally, the Municipality scheduled Colón to work from 8:00 a.m. to 4:00 p.m. during the week.  Due to health problems, however, Colón developed a pattern of absenteeism that continued throughout her employment.[3]  Her recurring absences made it

---

[3] Although the record shows reference to several health conditions or illnesses for which Colón sought leave, we limit our analysis to the alleged disability at issue here, fibromyalgia, for which Colón

-4-

necessary for her supervisors to temporarily shift Colón's work schedule and assignments in order to accommodate her absences and minimize work conflicts.

Several of Colón's supervisors testified as to the quality of Colón's work performance and overall attendance during her tenure. For instance, Lanzó testified that "in terms of the performance of her work, Nitza [Colón] was excellent." Lanzó acknowledged that despite her excellent work performance, she "would have liked for [Colón] not to get sick and to come to work" more often. Lanzó also noted that regardless of any health issues Colón might have undergone during her employment, "she would perform her tasks . . . [,] [i]n that sense I have no complaints about Nitza," and that Colón "never stopped doing her work the way she used to, she always did it." In contrast, Rodríguez stated that "most of [Colón's] absences were and are unannounced;" that her attendance "is totally unpredictable;" and that "[s]he is absent continuously, most of the time without prior notice."

## B. Municipality Attendance Policy

Although the Municipality's policies expressly require that all employees regularly and punctually attend work and comply with established work schedules, they do permit leave for illness.

---

sought reasonable accommodation and because of which she allegedly suffered retaliatory actions.

Specifically, the Municipality's attendance manual provides that career employees are entitled to accrue sick leave "proportional to the number of hours comprised by the assigned work schedule." If an employee exceeds her number of sick days, the manual states that "sick leave can be accrued up to a maximum of ninety (90) working days by the end of any calendar year." Additionally, the Municipality's "Manual Regarding Work Schedule, Attendance Registry, Accrual and Use of Leave" notes possible justifications for an employee's absence or tardiness, including an employee or family member's illness, an employee's injury, or a death in the employee's family. Lastly, the manual states that the Municipality is permitted to take disciplinary measures against an employee who is frequently absent from work in violation of established attendance norms or who exceeds the designated leaves of absence permitted.

## C. Co-Worker Observations of Colón's Health Problems[4]

Lanzó, one of Colón's supervisors, testified that in 2006, Colón's absences became "more and more frequent" and that Colón's family members sometimes called to inform the office that Colón would be absent on account of illness. Lanzó also stated that "sometimes [Colón] came in swollen" to the office, and that

---

[4] As will be addressed subsequently, we make no comment as to whether Colón's alleged health condition constituted a disability for purposes of her ADA claim. We offer this testimony solely for purposes of providing additional background color to the factual palette.

Colón claimed to have pain in "[h]er joints, her knees." Lanzó also noted that Colón "was not one to stand up alot [sic] . . . [and] remained at her . . . desk," and that "regardless of the pain [Colón] may have had . . . she would perform her tasks."

Yesiree Alemán O'Neill ("Alemán"), a coworker in the Auction Department, testified that because of her condition, Colón could not carry the work files, which were "very big and heavy," but that she otherwise was able to carry out her immediate work tasks. Adela Otero Ortiz ("Otero") also testified that Colón "was always feeling sick."

## D. Colón's Attendance Record

Colón's attendance record throughout her employment consists of numerous days during which she either was tardy or altogether absent from work on account of medical appointments, illness, or personal matters. Further, at times Colón's leave periods exceeded the amount permitted by the Municipality. On account of her excess leave days, the Municipality would take some form of compensatory action, like docking Colón's pay. A summary of Colón's attendance record reveals the following:[5]

In 1992, the Municipality approved Colón's request for the advancement of eighteen days of sick leave, but later denied a

---

[5] Additional details concerning Colón's attendance record will be addressed infra when considering her arguments on appeal.

subsequent request because Colón had "present[ed] a pattern debt on account of sick leave." Colón's performance evaluation for that same year noted that overall Colón "surpassed the expected result" in several performance categories, but that she needed to "work[] to recover her health to improve her attendance." In 1993, Colón was absent from work approximately twenty percent of the time, and in 1994, approximately fifty-nine percent of the time. The Municipality approved Colón's request for leave without pay from July 19, 1994 through January 18, 1995.

In 1995, Colón was on leave without pay from January 31, 1995 through April 25, 1995. In September of that same year, the Municipality sent Colón a letter informing her that as of September 30, 1995, she would "have no accrued leave balance." Colón's 1995 performance evaluation stated that Colón needed to make improvements in her attendance and that she "did not achieve [the] expected level" of attendance for that year.

In 1996, Colón was granted leave without pay for medical treatment for "an injury in [her] left foot" from May 16, 1996 through August 16, 1996.[6] Colón received high rankings on her 1996

---

[6] A letter from the Municipality dated June 14, 1996 provided that Colón's leave period for her foot treatment would be for three months. It also stated that "[s]ame was effective from March 16, 1996, and shall extend until August 15, 1996." It is unclear from the record whether the March 16, 1996 date was a typo, as all prior correspondence between Colón and the Municipality regarding her leave request refers to May 16, 1996. For purposes of our review, we need not determinatively resolve this matter as it remains clear that Colón was on leave for at least a quarter of the 1996 calendar

performance evaluation, but was informed that she needed to make improvements in her attendance.  In 1997, Colón sought leave without pay on account of a "surgical intervention of the knee on [her] left foot [sic]," which Human Resources forwarded along for approval in February 1997.[7]  In 2000, Colón was absent approximately twenty-three percent of the time she was scheduled to work.  In July of that year, Colón requested authorization for the transfer of five days of vacation leave from another employee's balance because she already had exhausted her own leave balance; the Municipality authorized the transfer.

In 2001, Colón was absent approximately twenty-five percent of the time she was scheduled to work.  In June of that year, Colón sent the Municipality a request to transfer days from several co-workers' balances because she already had exhausted all of her leave balances, including sick and annual leave; the Municipality approved Colón's request.  In December 2001, Colón again requested a transfer of days from co-workers because she had exhausted her leave balances.  Colón's 2002 attendance records show that she was absent approximately twenty-one percent of the total time she was scheduled to work, and that in May, she requested authorization to transfer several co-workers' leave time because

_____

year.

[7] Neither party has provided the Court with information concerning Colón's attendance record for the years 1998 and 1999.

-9-

she already had exhausted her leave balances.  The Municipality authorized the request.  Colón's 2002 performance evaluation noted that although Colón is "very responsible and diligent," her attendance "needs improvement."

In 2003, Colón was absent from work approximately twenty-five percent of the time.  Colón's performance evaluations for that year state that her overall attendance and punctuality "need[] improvement."  In October 2003, Colón sought to transfer co-workers' leave days because she had exhausted her annual and sick leave balances.  In 2004, Colón was absent approximately nineteen percent of the time, with her performance evaluation stating that her attendance and punctuality required improvement.  In 2005, Colón was absent approximately thirty percent of the time; her performance evaluator stated that her "health condition prevents her from attending regularly," but noted that "she has been improving greatly" in this area.

Colón was absent from work approximately fifty-nine percent of the time in 2006, requesting several -- subsequently granted -- leaves without pay (from January 1 through January 16; April 1 through April 30; October 3 through 23; October 24 through 30; and November 2 through January 12, 2007).  Colón was absent approximately fifty-six percent of the time in 2007, and approximately fifty-six percent of the time in 2008.  In October 2008, Colón applied for a three month period of leave without pay

because she already had exhausted her annual and sick leave balances; the Municipality granted Colón's request.

**E.   Shifting Gears: Colón's Reasonable Accommodation Request**

On October 24, 2006, Colón sent a letter to José Rivera requesting "a reserved parking space near the entrance and exit of" the Municipality Tower building "pursuant to medical recommendations and the provisions of the [Americans with Disabilities Act of 1990]." Colón's letter stated that she also had included medical evidence and information concerning reasonable accommodations.

On receiving no response, Colón sent a follow-up email to Rivera, copying Rodríguez, Lanzó, and Jorge Colomer Montes on November 1, 2006. On November 2, 2006, Rivera emailed Colón stating that "due to parking space needs at this time we cannot assign [you] a reserved parking space." Rivera also provided that if Colón had a handicapped identification pass, she could use any of the six parking spaces specifically assigned for handicapped persons that were located near the building's entrance.

Rivera testified that he received no response from Colón after his November 2 reply, and thus, he "took it as if she had accepted it . . . I didn't see why I had to look any further." Rivera also testified that sometime after his November 2 response, he and Colón had an informal encounter during which the subject of Colón's parking spot request was raised. Rivera stated that he

-11-

again informed Colón that there were no parking spaces available "because the parking lot was full," i.e., all spots had been assigned to other Municipality employees. Rivera also stated that he was aware of Colón's subsequent petition to the Office of the Ombudsman for Persons with Disabilities.

**F. Turning to Administrative and Judicial Highways: Petitions, Complaints and Motions**

Colón filed a petition with the Office of the Ombudsman for Persons with Disabilities on March 28, 2007. In this petition, Colón explained that on account of her health condition, which her doctor had determined did not allow her to walk long distances, Colón had requested a parking spot as a reasonable accommodation. Colón stated that the Municipality denied her accommodation request, instead offering her the use of reserved handicapped parking spots, which generally were unavailable by the time Colón arrived at work. Colón reiterated her request for a parking spot.

Colón also filed a "Notice of Charge of Discrimination" with the Equal Employment Opportunity Commission ("EEOC") against the Municipality Mayor on June 18, 2007. Colón alleged discrimination under the ADA, retaliation, and continuing violations against her for having requested a reasonable accommodation. The EEOC responded on August 31, 2007, informing Colón of her right to sue.

On November 11, 2007, Colón filed her original complaint in this dispute against the Municipality, which she subsequently

amended on September 12, 2008.  Docket Nos. 1, 48.  In her amended complaint, Colón asserted that the Municipality discriminated and retaliated against her in violation of the ADA and the Rehabilitation Act, and that it retaliated against her in violation of Title VII of the Civil Rights Act.  Colón also raised supplemental Commonwealth claims under Article 1802 of the Puerto Rico Civil Code, Law No. 115 of December 20, 1991, and Law No. 44 of July 2, 1985.[8]

On August 31, 2009, the Municipality moved for summary judgment.  Colón filed her opposition on September 21, 2009, and the Municipality replied on October 16, 2009.  On December 2, 2009, the district court granted the Municipality's summary judgment motion.  Finding no genuine issue of material fact as to Colón's various allegations, the court dismissed Colón's claims of disability discrimination and retaliation with prejudice, and it dismissed Colón's Commonwealth law claims without prejudice.  Colón appealed, raising several evidentiary matters and asserting that the district court erred in dismissing her ADA claim, her retaliation claim, her hostile work environment claim, and her equal protection claim.

---

[8]  Colón also alleged an equal protection claim in the jurisdiction section of her amended complaint, to be addressed infra.

## II.  Discussion

### A. Standard of Review

We start our appellate engines considering the applicable standard of review.  Summary judgment is properly granted where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant must support her motion by citing specifically to materials in the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

"The scope of appellate review of entry of summary judgment in ADA cases, as in all others, is de novo."  Mulloy v. Acushnet Co., 460 F.3d 141, 145 (1st Cir. 2006) (quoting EEOC v. Amego, Inc., 110 F.3d 135, 141 (1st Cir. 1997)) (internal quotation marks omitted).  We must construe "the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor" while safely ignoring "conclusory allegations, improbable inferences, and unsupported speculation." Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002) (citation and internal quotation marks omitted).  In doing so, "we are not married to the trial court's reasoning but, rather, may affirm on any independently sufficient ground made manifest by the record." Cahoon v. Shelton, 647 F.3d 18, 22 (1st Cir. 2011).

**B.  Evidentiary Issues**

At the outset, we address several of Colón's evidentiary arguments which she contends justify a finding of reversible error. Because these evidentiary arguments affect the record we review in determining whether the district court appropriately granted summary judgment, we turn to these arguments first.

**1.  Translation of Exhibits**

Colón submits that the district court disregarded "crucial and significant evidence" filed in support of Colón's opposition to summary judgment motion on the grounds that such exhibits either had not been directly translated into English, or corresponding translations were not provided with the exhibits. Colón asserts that the district court's refusal to consider such evidence constitutes reversible error because the exhibits either were filed in English or submitted with their corresponding translations, thereby requiring the court's consideration. Colón lists the following exhibits as those disregarded by the district court: 1, 17, 18, 20, 21, 23, 31, 35, 37, 38, 41, and 42.

We begin with Local Rule 5(g) of the United States District Court for the District of Puerto Rico, which provides that "[a]ll documents not in the English language which are presented or filed, whether as evidence or otherwise, <u>must</u> be accompanied by a certified translation into English . . . ." D.P.R. Civ. R. 5(g) (emphasis added); <u>see also</u> 48 U.S.C. § 864 (providing that "[a]ll

-15-

pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language") (emphasis added); González-De-Blasini v. Family Dep't, 377 F.3d 81, 89 (1st Cir. 2004) (holding that "[t]he district court should not have considered any documents before it that were in the Spanish language") (emphasis added).  Thus, the law is clear that any submitted exhibit not directly translated into English or provided with a corresponding English translation may properly be disregarded by the district court.

In this case, we view the scope of Local Rule 5(g) through the prism of another local rule, Rule 56, also known as the anti-ferret rule in the District Court for the District of Puerto Rico.  See P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010).  Local Rule 56, which governs summary judgment motion practice, requires, among other requisites, that each party submit "separate, short, and concise" statements of fact that are set forth in numbered paragraphs with specific citations to the record, including "the specific page or paragraph of identified record material supporting the assertion."  D.P.R. Civ. R. 56(b), (c) & (e).  The purpose of this practice "is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."  CMI Capital Mkt. Inv., LLC v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008) (footnote omitted).  Thus, when read in connection with Local

-16-

Rule 5(g), it is clear that parties moving for or opposing summary judgment in the District Court for the District of Puerto Rico, in addition to providing "short[] and concise" statements of material fact containing proper citations to the identified record, must also provide exhibits that either have been translated into English, or that contain a corresponding translation thereto.

"We review the district court's application of a local rule for abuse of discretion." Mariani-Colón v. Dep't of Homeland Sec. ex. rel. Chertoff, 511 F.3d 216, 219 (1st Cir. 2007) (citation omitted); see also Peña-Crespo v. Puerto Rico, 408 F.3d 10, 14 (1st Cir. 2005) (finding no abuse of discretion where district court excluded plaintiff's expert testimony because plaintiff did not provide an English translation of the expert's report and resume). Here, the district court stated that Colón "failed to translate numerous exhibits . . . . No translations were submitted for Exhibits 1, 17, 18, 20, 21, 23, 31, 33, 35, 37, 38, 39, 41, and 42. Any fact alleged by Colon-Fontanez that is based on an untranslated exhibit will be disregarded." See Colón-Fontánez v. Municipality of San Juan, 671 F. Supp. 2d 300, 309 (D.P.R. 2009). Reviewing the evidence before us, it is clear that, at least in the appellate record, the majority of the aforementioned exhibits contain English translations.[9] What is entirely unclear from this record, however,

---

[9] Only exhibits 20, 33, 38, and 39 presently do not have a corresponding English translation available. Because it does not appear from the record as if any translation ever was provided as

-17-

is if or when these translated exhibits were provided to the district court below.[10]

According to the record, three different motions to submit certified translations in support of Colón's opposition to summary judgment motion were provided to the court. The first motion, dated October 7, 2009, moved to submit the following exhibits: 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15. The second motion, also dated October 7, 2009, moved to submit the following exhibits: 16, 22, 24, 25, 26, 27, 28, 29, 30, 32, 34, 36,

---

to these four exhibits, we find no abuse of discretion in the district court's refusal to consider them.

[10] Interestingly, appellee does not argue this point. Instead, appellee seems to concede, with no reference to the record, that "English translations were provided for the balance" of the exhibits. This unsubstantiated statement is insufficient for purposes of confirming when or if these exhibits were submitted.

Indeed, at first blush on our review, it appeared as though English translations had been provided for the contested exhibits because we located them in the appellate record. However, the translated exhibits appear immediately after Colón's Index of Exhibits, which according to the district court docket, was filed with exhibit attachments on September 21, 2009, but none of which were translated. Docket 187. Further confirming this point, Colón filed a motion for an extension of time by which to file translations for the submitted exhibits on September 22, 2009, see Docket 182, which the court granted in part that same day, giving Colón until October 7, 2009 to file the English translations. Docket No. 186. On October 7 and 11, 2009, Colón filed three different motions to submit certified translations, which did not include exhibits 1, 17, 18, 19, 20, 21, 23, 31, 33, 35, 37, 38, 39, and 41.

-18-

40, and 42.  The last motion, dated October 11, 2009, moved to submit exhibit 19.[11]

These appear to be the only motions in the record pursuant to which Colón sought to enter certified translated exhibits to her opposition to summary judgment into the district court's record.  Thus, by process of elimination, it seems that the only exhibits for which Colón failed to file a motion to submit certified translations were exhibits 1, 17, 18, 19, 20, 21, 23, 31, 33, 35, 37, 38, 39, and 41.[12]  It is impossible for us, reviewing the record cold on appeal, to determine when, how, and -- most importantly, if -- these other translated exhibits were submitted to the district court.  A review of the district court's docket suggests that any such translations either were never submitted, or were not filed in accordance with proper procedures.  Because the "law incontrovertibly demands that federal litigation in Puerto

---

[11]  Though the district court set a deadline of October 7, 2009, for the filing of the certified exhibit translations, the record shows that the district court accepted the later filing of Exhibit 19 on October 13, 2009.  See Docket 210.

[12]  We note that the district court listed exhibit 42 as one of the exhibits that it would disregard because no English translation was provided.  See Colón-Fontánez, 671 F. Supp. 2d at 309.  On reviewing the record, however, it seems clear that Colón's second motion to submit exhibits with certified translations did, in fact, include exhibit 42 (deposition of Adela Otero).  A review of the record also shows that the district court actually did consider this exhibit, discussing it at length in assessing Colón's allegations of retaliation and a hostile work environment.  See id. at 321, 323, 324 & n.35, 337.  Thus, any error in the district court's statement that it would disregard exhibit 42 is harmless.

-19-

Rico be conducted in English," and that the district court "sift out non-English materials" when "collecting a record for summary judgment," we cannot say that the district court's refusal to consider exhibits for which an English translation either was never provided or was never properly filed with the court constituted an abuse of discretion. Estades-Negroni v. Assoc. Corp. of N. Am., 359 F.3d 1, 2 (1st Cir. 2004); see also Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 118 (1st Cir. 2005) (finding no abuse of discretion where district court excluded from consideration documents not filed in English).

### 2. Admission of Materials Prepared by a Paralegal

Colón also asserts that the district court committed reversible error when it admitted pursuant to Fed. R. Evid. 1006 statements, charts, and computerized reports that had been prepared by a paralegal belonging to the law firm representing the Municipality in this case. We review the court's admission of an exhibit, like summary charts, for abuse of discretion. United States v. DeSimone, 488 F.3d 561, 576 (1st Cir. 2007).

We find no error in the district court's admission of the summary graphs. Rule 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed. R. Evid. 1006. The summary charts and graphs at issue consisted of a condensed

presentation of Colón's extensive record of work attendance over her near two-decade period of employment.  Thus, the charts served as an appropriate presentation of "voluminous writings" that "cannot conveniently be examined in court," as required by Rule 1006.  Further, the underlying materials on which the summary evidence was based were admissible in evidence pursuant to Fed. R. Evid. 803(6), as they consisted of attendance records kept in the course of the Municipality's regularly conducted business, according to a regular procedure, and for a routine business purpose.  See United States v. Davis, 261 F.3d 1, 42 n.37 (1st Cir. 2001) (noting that for summary evidence to be admissible, the materials on which it is based also must be admissible in evidence); see also United States v. Loney, 959 F.2d 1332, 1341 (5th Cir. 1992).

Colón has two main arguments as to why the district court should not have considered the summary charts: (1) the summary graphs were never produced to Colón during the discovery process; and (2) an appropriate foundation to the charts was not properly laid because the individual who prepared the charts (i) was never announced as a witness in the case, (ii) prepared the charts in anticipation of litigation, and (iii) was a paralegal who lacked

the requisite expertise to testify in support of their admission. Colón's arguments are non-starters.[13]

Regarding Colón's first argument, Rule 1006 provides that only the underlying documents, not the summaries themselves, must be produced to the opposing party. See Fed. R. Evid. 1006 ("The originals [of the contents of the writings], or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place."). The circuits recognize this well-settled principle. Air Safety, Inc. v. Roman Catholic Archbishop of Boston, 94 F.3d 1, 7 & n.14 (1st Cir. 1996); see also United States v. Bakker, 925 F.2d 728, 736 (4th Cir. 1991) ("The

---

[13] Colón also argues that because the paralegal represented in her affidavit that she had interviewed Mercedes Casanova ("Casanova"), a Municipality office clerk, when preparing the attendance summaries, and because she incorporated Casanova's statements into her affidavit, the district court should not have admitted the summary charts into evidence. It seems clear that the paralegal's interview of Casanova was part and parcel of her methodology for organizing the numerous attendance records in an accurate manner. Thus, if Colón challenges the means used by the paralegal in preparing the summary charts, we reject this as a valid hearsay objection. If Colón wanted to challenge the exhibits' substance, she could have submitted evidence countering their content.

If Colón challenges the court's admission of the paralegal's affidavit on the grounds that it contained hearsay, we still find no merit to this argument. The statements contained in the paralegal's affidavit are copied verbatim from Casanova's affidavit -- also submitted to the court -- in which she, as the underlying records' custodian, confirmed the reliability of the business records and the accuracy of the summary reports. Even if Colón's hearsay argument could be deemed to have legs, any error in admitting the summary exhibits was harmless, given that the underlying evidence on which the exhibits were based was still admissible, and given that Casanova's statements also were still admissible through her custodian affidavit.

-22-

language of [Rule 1006] . . . simply requires that the [original voluminous] material be made available to the other party."); Coates v. Johnson & Johnson, 756 F.2d 524, 550 (7th Cir. 1985) (Rule 1006 requires that "only the underlying documents, and not the summaries, must be made available to the opposing party"). Thus, Colón's first argument as to the summary charts is incorrect: the Municipality had no obligation to provide the charts to Colón.

Turning to Colón's multi-faceted second argument, we first note that the paralegal who prepared the charts was announced to Colón. The same day on which the Municipality submitted its exhibits in support of its summary judgment motion, September 1, 2009, it also submitted the name and position of the paralegal who prepared the summary charts. Thus, Colón had ample notice of the paralegal's identity and position, her role in relation to the chart preparation, and the likelihood that she could serve as a witness at trial. See United States v. Caballero, 277 F.3d 1235, 1247 (10th Cir. 2002) (finding that testimony from witness who summarized business records "was not a surprise to defendants who had been notified of the witnesses and the substance of their testimony during the pretrial phase").

Second, the district court specifically acknowledged that the summary charts were prepared in anticipation of litigation, and factored this into its consideration, stating:

> The Court understands that the summary
> materials were prepared by the Municipality's

-23-

> counsel for trial purposes and will consider the credibility and weight of the prepared attendance charts and graphs with due knowledge of that and of the fact that the paralegal worked only with the documents available to her. For that reason, the Court views the percentages of attendance as approximations.

Colón-Fontánez, 671 F. Supp. 2d at 312 n.15 (emphasis added); Kestenbaum v. Falstaff Brewing Corp., 575 F.2d 564, 575-76 (5th Cir. 1978) (court rejected defendant's objection to summary exhibits on grounds that they had been prepared in anticipation of litigation because summary was offered under and complied with Fed. R. Evid. 1006 and underlying records were made available to opposing counsel).

Third, for summary evidence to be admitted into court, there must be, like all evidence, a proper foundation laid for its admission. In the context of a summary exhibit, the proponent of the exhibit "should present the testimony of the witness who supervised its preparation." United States v. Bray, 139 F.3d 1104, 1110 (6th Cir. 1998). Here, the Municipality offered the testimony of the paralegal who prepared the exhibits summarizing Colón's attendance record. The fact that the paralegal could testify as to her method of preparing and summarizing the exhibits does not an instant expert of her make. See United States v. Milkiewicz, 470 F.3d 390, 401 (1st Cir. 2006) (finding no merit to appellant's argument that witness who prepared summary exhibits lacked the expertise to summarize the financial information represented in the

-24-

charts, and noting that "creating summaries of the data took patience <u>but not expertise</u>" (emphasis added)); <u>see also</u> <u>S.E.C.</u> v. <u>Franklin</u>, 265 F. App'x 644, 646 (9th Cir. 2008) (finding "no error in allowing the preparer of the [summary exhibits] to testify because no expert opinions or conclusions were offered") (citation omitted); <u>Caballero</u>, 277 F.3d at 1247 (noting that witnesses who "summarized business records and client lists and presented them in condensed form . . . expressed neither a lay nor an expert opinion"). Moreover, the fact that she was a paralegal employed by defendants' counsel, and not by the Municipality itself, does not, in this case, affect the admissibility of the charts. <u>See</u> <u>Coates</u>, 756 F.2d at 550 (finding that court properly admitted summary evidence prepared by a paralegal employed by defendants' counsel because underlying records consisted of memoranda memorializing employee performance prepared in the regular course of defendant's business and were prepared in a trustworthy manner).

Further, Colón's argument that the paralegal was not qualified to review and analyze Colón's attendance records holds little force. As the district court noted, "[t]he sworn statement of the paralegal who prepared the summary charts and graphs goes into great detail about the documents relied upon and methodology used to develop the materials submitted to the Court." <u>Colón-Fontánez</u>, 671 F. Supp. 2d at 312 n.15. Colón offers no argument or explanation as to what qualifications or expertise should have been

-25-

required of the preparer of her attendance record charts, nor does she ever contest the content of the summary charts. We thus fail to see how the district court's admission of the paralegal's summary charts constituted an abuse of discretion warranting reversal. See Fraser v. Major League Soccer, LLC, 284 F.3d 47, 67 (1st Cir. 2002) (noting that "[i]t is hard to imagine an issue on which a trial judge enjoys more discretion than as to whether summary exhibits will be helpful").

In sum, we find no error in how the district court handled the summary exhibits.

## C. ADA Reasonable Accommodation Claim

Colón contends the district court erred in dismissing her reasonable accommodation claim under the ADA by concluding that she was not a "qualified individual." The Municipality responds that the district court properly determined that Colón was not a qualified individual under the ADA because Colón failed to satisfy an essential job function, attendance.

### 1. Overview of an ADA Claim

The ADA prohibits covered employers from discriminating against a qualified individual with a disability. 42 U.S.C. § 12112(a). A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). Discrimination under the ADA includes "not making

-26-

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless . . . the accommodation would impose an undue hardship on the operation of the business." Id. § 12112(b)(5)(A).

To establish a claim under the ADA, a plaintiff must prove three factors by a preponderance of the evidence: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) the employer took an adverse employment action against her because of the alleged disability. Carroll, 294 F.3d at 237; see also Ríos-Jiménez v. Principi, 520 F.3d 31, 41 (1st Cir. 2008). Because we find that Colón failed to establish the second element of an ADA claim, i.e., show that she was a qualified individual under the ADA, we limit our analysis to this factor.[14]

### 2. Qualified Individual: Two-Part Analysis

Whether an individual is qualified under the ADA is a two-step analysis. See 29 C.F.R. § 1630.2(m). The employee bears the burden to show, first, that she possesses the requisite skill, experience, education, and other job-related requirements for the position, and second, that she is able to perform the position's

---

[14] The parties on appeal likewise limited their arguments solely to the issue of whether Colón constituted a qualified individual under the ADA.

essential functions with or without reasonable accommodation. García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000). We address each in turn.

Construing the record in the light most favorable to the nonmovant, Colón satisfies the first prong. The evidence shows multiple work performance evaluations of Colón in which the reviewer observed that Colón met or exceeded performance levels when present at work. For instance, Colón received high marks on her 1991-1992 and 1995-1996 work performance evaluations. Her evaluations from 2001-2005 all described Colón, among other complimentary descriptions, as a responsible, diligent, efficient, and positive worker who contributed to the goals of the office. These same evaluations from early to mid-2000s also marked Colón as either "good" or "superior" in her performance levels. One of Colón's supervisors, Julia Lanzó, described Colón's work performance as "excellent." Based on these facts, a factfinder reasonably could determine that Colón possessed the requisite skill, experience, and job-related requirements for the position of Auction Officer.

However, our "qualified individual" inquiry does not end with an evaluation of the quality of Colón's work performance. The more pertinent question is whether Colón established that she was able to perform her position's essential functions without reasonable accommodation, "and if not, whether 'any reasonable

accommodation by her employer would allow her to do so.'" Mulloy, 460 F.3d at 147 (quoting Phelps v. Optima Health, Inc., 251 F.3d 21, 25 (1st Cir. 2001)).

An essential function is one that "bear[s] more than a marginal relationship to the job at issue." Chandler v. City of Dallas, 2 F.3d 1385, 1393 (5th Cir. 1993). It is a "fundamental job duty . . . [that] can extend beyond 'an employee's technical skills and experience.'" Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 22 (1st Cir. 2004) (quoting Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000)) (internal quotation marks omitted). This Court -- as well as the majority of circuit courts -- has recognized that "attendance is an essential function of any job."[15] Ríos-Jiménez, 520 F.3d at 42; see also

---

[15] Mulloy, 460 F.3d at 152 (finding that employee's "physical presence was an essential function of his job"); see also Vandenbroek v. PSEG Power CT LLC, 356 F. App'x 457, 460 (2d Cir. 2009) (noting that "reliable attendance . . . was an essential function" of an employee's position); Miller v. Univ. of Pittsburgh Med. Ctr., 350 F. App'x 727, 729 (3d Cir. 2009) (noting that "[a]ttendance can constitute an essential function under the ADA"); Brenneman v. MedCentral Health Sys., 366 F.3d 412, 418-19 (6th Cir. 2004) (attendance can be an essential function of a position; excessive absenteeism rendered employee unqualified for his position); Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1122 (10th Cir. 2004) (finding that district court "properly held [employee's] physical attendance at [work] was an essential function of [her] position"); Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1306 (11th Cir. 2000) ("[J]ob presence . . . has been held to be an essential function of a job."); Waggoner v. Olin Corp., 169 F.3d 481, 483, 485 (7th Cir. 1999) (stating that "an employee who does not come to work cannot perform the essential functions of his job" (quoting Nowak v. St. Rita High Sch., 142 F.3d 999, 1003 (7th Cir. 1998))) (internal quotation marks omitted); Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1048 (8th Cir. 1999) ("[I]t is

-29-

<u>Mulloy</u>, 460 F.3d at 152.  On these facts, it is clear that regular attendance was an essential function of Colón's job.  Indeed, her job description, municipal regulation, and her supervisors' testimony confirm that physical presence at her job was an understood expectation and requirement.  The record reveals that Colón cannot show she met this essential function.

First, the same performance evaluations that Colón contends the district court did not properly consider in evaluating her work performance repeatedly note that, regardless of her overall work performance, attendance was a continued area of needed improvement for Colón.

Second, the record shows that Colón's absenteeism was long-established, dating well before her 2005 fibromyalgia diagnosis.  A review of this evidence shows that in 1992, the Municipality approved one of Colón's requests for the advancement of sick leave (eighteen days), but denied another request because Colón's attendance record showed her to be "frequently absent from [her] job, presenting a pattern debt on account of sick leave."  In 1993, Colón was absent approximately twenty percent of the time she

---

axiomatic that in order for [an employee] to show that she could perform the essential functions of her job, she must show that she is at least able to show up for work."); <u>Hypes ex rel. Hypes</u> v. <u>First Commerce Corp.</u>, 134 F.3d 721, 727 (5th Cir. 1998) ("[R]egular attendance is an essential function of most jobs."); <u>Tyndall</u> v. <u>Nat'l Educ. Ctrs., Inc. of Cal.</u>, 31 F.3d 209, 213 (4th Cir. 1994) ("An employee who cannot meet the attendance requirements . . . cannot be considered a 'qualified' individual protected by the ADA.").

-30-

was scheduled to work, and in 1994, approximately fifty-nine percent of the time. From January 31, 1995 through April 25, 1995, Colón, having exhausted all of her leaves, was on leave without pay. From at least May 16, 1996 through August 15, 1996, Colón was on leave because of a foot injury. From November 15, 1996 through February 18, 1997, Colón again was on leave without pay. In 2000, Colón was absent approximately twenty-three percent of the time she was scheduled to work; in 2001, approximately twenty-five percent of the time; in 2002, approximately twenty-one percent of the time; in 2003, approximately twenty-five percent of the time; in 2004, approximately nineteen percent of the time; and in 2005 -- the year in which Colón was diagnosed with fibromyalgia -- she was absent approximately thirty percent of her scheduled work time.

Third, the record does not support Colón's assertion that, because the Municipality never advised her of any consequences that might be incurred from her absences, attendance cannot be deemed to have been an essential function of her position. The record suggests otherwise.

An internal document describing Colón's position establishes that physical attendance at work was a necessary aspect of her job. Auction papers could not be removed from the office, and Colón was required, among other duties, to draft bid notices, submit bid proposals for recommendations, submit recommendations to the Board, attend openings and holdings of bids, direct

administrative work, and communicate with other departments regarding bid matters or status, all of which required her physical presence in the office. Indeed, Colón notably has never argued that she could perform such duties from home.

Further, the Municipality's "Manual Regarding Work Schedule, Attendance Registry, Accrual and Use of Leave" expressly provides that the Municipality may take disciplinary measures if an employee violates attendance norms by being frequently absent from work. The Municipality's policies also establish that employees are expected to attend work regularly and punctually. Lastly, the evidence shows that Colón received documentation on numerous occasions from the Municipality as of at least 1992 advising her of her leave balance (or exhaustion thereof); reminding her of the Municipality's Personnel Regulations on her duty to comply with regular and punctual attendance; informing her of docked pay due to overpayment after a period of unpaid leave; and evaluating her attendance as unsatisfactory and in need of improvement.[16]

---

[16] In brief: (1) on July 11, 1994, Colón received a letter from the Municipality informing her that, as of June 30, 1994, she had "exhausted the total regular vacations" and her pay would be discounted for time owed, and reminding her of the Municipality's attendance and punctuality policies; (2) on September 29, 1995, the Municipality sent Colón a letter informing her that as of September 30, 1995, she had no remaining leave balance, that if she continued to be absent, the Municipality would have to withhold her paycheck, and that she had a continuing obligation to "comply with established work schedule;" (3) on March 13, 1997, the Municipality discounted Colón's salary because she "improperly collected a check for the first bimonthly pay period of November, 1996;" (4) on February 15, 2000, the Municipality informed Colón that because she

Fourth, Colón does not deny her consistent lack of attendance throughout her employment. Instead, she argues that it is not relevant for two reasons: (1) because the court's ADA analysis must be made as of the date of the challenged employment decision, which was 2006 (when she requested and was denied a reserved parking spot); and (2) because a lack of available parking spaces, not her absenteeism, was the reason for which the Municipality denied her a reserved parking space. Colón's arguments are incorrect.

---

did not meet the required leave balance, she would be removed from direct deposit, and if she were absent from work again, she would not receive her next paycheck; that same letter updated Colón as to the Municipality's new attendance system pursuant to which any days owed by an employee would be discounted from her salary instantly, and reminded her of the importance of regularity and punctuality in attendance; (5) on May 25, 2000, the Municipality sent Colón a letter informing her that as of April 2000, the Municipality was going to deduct owed leave days from her salary, and reminding her of the Municipality's attendance policies; (6) on June 10, 2005, the Municipality sent Colón a letter advising her that her leave balance was getting low and that if she exceeded it, the Municipality would have to deduct from her paycheck; the letter also reminded Colón of the Municipality's attendance policies; (7) on August 12, 2005, the Municipality sent a letter to Colón citing an Executive Order regarding employees' obligation to comply with attendance procedures, and informing her that as of July 2005, her leave balance was low and money would be deducted from her paycheck if she exceeded it; (8) on September 9, 2008, the Municipality sent Colón a memorandum in which the Municipality's attendance protocols were set forth, and stating that as of August 31, 2008, she had exhausted her regular leave and any overpayment would be deducted from subsequent paychecks; and (9) on October 10, 2008, Colón received a letter informing her that she had incurred thirty-two absences and four "tardiness events" over a two month period, and reminding her of the importance of work attendance.

Colón's pattern of absenteeism is relevant for purposes of assessing whether she is a qualified individual under the ADA, and this determination, as previously stated, turns on whether Colón can establish that she was able to perform her position's essential functions with or without reasonable accommodation. The record, both pre-dating and post-dating her 2005 diagnosis, makes overwhelmingly clear that Colón could not satisfy regular attendance requirements.

Moreover, and without addressing the reasonableness of the requested accommodation at issue, it is questionable whether Colón's ability to perform her position's essential function of attendance would have improved with the granting of a reserved parking space. The evidence shows the Municipality made extensive reasonable accommodations for Colón throughout her years of employment without sanction or recrimination, including: allowing Colón to take sick leaves; extending the duration of already granted sick leaves; authorizing her to transfer leave balances from co-workers to her own exhausted balance; assigning her an assistant, both to help with work coverage and to ensure that work would not be disrupted during Colón's unpredictable absences; and offering her the use of handicapped spots with the appropriate identification card. None of these accommodations led to any improvement in Colón's attendance levels.

Thus, regardless of Colón's noted skills or experience, her extensive absenteeism rendered her unqualified to perform her position's functions, and this absenteeism recurred even with the Municipality's various reasonable accommodations over the years. See Matzo v. Postmaster Gen., 685 F. Supp. 260, 263 (D. D.C. 1987), aff'd, 861 F.2d 1290 (D.C. Cir. 1988) (holding that a secretary's poor attendance record rendered her unqualified for her position, even though her skills, experience, and education were "unexceptionable" and coupled with "uniformly favorable performance appraisals"). For these reasons, we hold that Colón was not a "qualified individual" under the ADA. Thus, her discrimination claim fails.

## D. Allegations of Retaliation[17]

Case law recognizes that an ADA plaintiff need not succeed on a disability discrimination claim in order to assert a claim for retaliation. See Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997). For Colón to establish a retaliation claim, she must show that: (1) she was engaged in protected

[17] Colón claims the district court committed reversible error when it stated it would give each alleged retaliatory act the "minimal attention each deserve[d]." Colón-Fontánez, 671 F. Supp. 2d at 332 n.41. The district court noted that Colón failed to support each of her listed retaliatory acts in her opposition motion with any immediate legal analysis or case law citation, instead providing a general discussion following the listed acts. Because the court's analysis makes clear that it thoroughly considered each of Colón's listed acts and relevant case law, we find no error, let alone an error warranting reversal. See id. at 332-36.

conduct; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action. Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006); see also Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003).

The district court found, and we agree, that Colón meets the first requirement. Colón requested reasonable accommodation for her alleged disability in the form of a reserved parking space on October 24, 2006. Colón followed up on her request on or about November 1, 2006. On November 2, 2006, she was informed that a reserved parking spot could not be assigned to her.

The Municipality does not dispute that Colón engaged in protected activity. Instead, it contests Colón's ability to establish the second and third factors of a retaliation claim, i.e., Colón cannot show she suffered an adverse employment action that both caused her material harm and is linked to her request for a parking spot.

To establish an adverse employment action, Colón must show that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzáles, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).

For retaliatory action to be material, it must produce "a significant, not trivial, harm," Carmona-Rivera, 464 F.3d at 20; actions like "petty slights, minor annoyances, and simple lack of good manners will not [normally] create such deterrence." Burlington Northern, 548 U.S. at 68. However, "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees" may constitute adverse employment action, subject to the facts of a particular case. Hernández-Torres v. Intercont'l Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998); see also Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (noting that adverse action determination requires a case-by-case inquiry).

For causality to be established, the plaintiff must show a nexus between the protected conduct and the alleged retaliatory act. Wright, 352 F.3d at 478; see also Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005) (noting that to establish a prima facie case of retaliation, a plaintiff must show that the defendant "took an adverse employment action against him because of, in whole or in part, his protected [conduct]"). "One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994).

We address each of Colón's alleged retaliatory acts in turn, relying on her categorization of the acts on appeal and applying an objective standard.[18] See Burlington Northern, 548 U.S. at 68-69; Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 472 (1st Cir. 2010) (test for retaliation is "objective" and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances") (quoting Burlington Northern, 548 U.S. at 71) (internal quotation marks omitted).

## 1. Temporary Removal of Work Equipment

Colón, relying on the testimony of co-worker Adela Otero, asserts the Municipality eliminated her "essential working tools" in retaliation for her October 2006 request for a parking spot. Otero testified in her deposition that sometime after Colón returned to work following a health-related absence (unclear from the record as to when), Colón had to work without a telephone for approximately two to three months. Otero also testified that the

---

[18] Colón argues that the district court's individual evaluation of her alleged retaliatory acts was improper because it should have evaluated the acts "collectively as a whole." A review of Colón's opposition motion makes clear that she did not specify whether she wanted the court to consider each of her alleged retaliatory acts separately or collectively. See Billings v. Town of Grafton, 515 F.3d 39, 54 n.13 (1st Cir. 2008) (noting that because plaintiff "has not presented an argument about the collective effect . . ., we have considered the alleged acts of retaliation independently"). Because Colón presented no argument, below or on appeal, as to the collective effect of the alleged acts, we find no error in the court's individual assessment of each act.

Municipality failed to provide Colón with tools with which to carry out her work (also unclear as to when), and in 2008, following a health-related absence, Colón's computer was taken away for several weeks, requiring her to complete all work manually.

Colón's supervisor, Rodríguez, testified that no tools were withdrawn from a worker's desk unless it was for short periods of time and for purposes of repair, such as an out-of-order phone or malfunctioning computer. Otero's testimony does not contradict Rodríguez's assertions. Otero testified that Colón "was without a computer and then they were cleaning the machines . . . ." Colón argues the district court improperly inferred from this testimony that employee work equipment sometimes was removed for the overall maintenance purpose of cleaning. We disagree.

The record shows that Otero's statement was in response to the question, "you say that when [Colón returned to work in 2008], that's when she was without a computer?" Otero's testimony directly links the removal of Colón's equipment to the Municipality's maintenance practices. Rodríguez's testimony further compliments and clarifies Otero's testimony. And both testimonies establish that any such removal of Colón's office equipment was temporary.

Additionally, even if the record did not clearly show a non-retaliatory purpose for the removal of Colón's office equipment, Colón offers no evidence, aside from Otero's testimony,

showing that any removal of her work equipment was motivated by retaliatory intent. See Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) (stating that for plaintiff to prevail on summary judgment, she must show that any alleged adverse action was "taken for the purpose of retaliating" and "point to some evidence of retaliation") (emphasis in original). At most, Colón asserts "there is no evidence that prior to [her] request for reasonable accommodation, her computer and telephone were taken away for months for cleaning purposes," and that the "elimination of [her] working tools were part of the pattern of retaliatory acts against her." This is insufficient for purposes of establishing a genuine issue of material fact. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) ("Not every discrepancy in the proof is enough to forestall a properly supported motion for summary judgment . . . . On issues where the nommovant bears the ultimate burden of proof, he must present definite, competent evidence.").

### 2. Withholding of Paychecks

Colón submits that the Municipality, in retaliation for her accommodation request, withheld her paychecks for four pay periods, including the months of July and August 2007. Colón does not provide specific dates for when her re-deposited or refunded checks were issued, or when she actually received her reimbursed or refunded payments; she instead asserts generally that she was not paid in July or August 2007.

In contrast, the Municipality provided evidence -- consisting of letters between the Municipality and Colón, letters between the human resources and executive departments, letters between the various finance offices, data processing sheets, and various refund notices -- supporting each instance when Colón's paychecks were delayed, withheld, docked, or otherwise irregular. The Municipality also proffered an email communication in which Colón contacted Municipal Secretary Alicea on August 29, 2007, stating she had not received any payroll payment since July 20, 2007; Alicea forwarded Colón's email that same day to Human Resources Director Antonio Alvarez Torres stating, "I request your help in processing this case promptly;" that same day, the Municipality issued a check to Colón for $328.51.

The record additionally shows that the Municipality issued fourteen payroll checks to Colón between May 31, 2007 and December 21, 2007, all of which were signed and cashed. Thus, although Colón contests the Municipality's position that any withheld, docked, or delayed paychecks were paid and/or justifiably attributable to days owed or insufficient remaining sick or annual leave, the evidence clearly shows otherwise.

Colón raises additional arguments. Colón claims the district court failed to consider evidence showing that other employees who previously owed days or exhausted their leave balance still have received their paycheck or not suffered as long a delay

in receiving their reimbursement, all of which she asserts is indicative of the Municipality's retaliatory intent in withholding or delaying her paychecks.

The record shows the district court did in fact consider such evidence, specifically, the testimony of employee Adela Otero, an Administrative Officer II for the Municipality, who testified that other employees with no remaining leave balance received refund checks whereas Colón allegedly did not. Colón-Fontánez, 671 F. Supp. 2d at 321. Further, the record does not support the contention that Colón failed to receive payment, whether in the form of refund checks or otherwise. Thus, we do not find this testimony to be sufficient for purposes of establishing a genuine issue of material fact as to retaliation.

Colón also asserts that the Municipality's "decision to withhold plaintiff's paycheck was discriminatory and in retaliation for Colón's decision to request reasonable accommodation." We have two responses.

First, Colón offers no evidence showing retaliatory intent associated with the delay in payment, or evidence establishing that the delay exceeded that attributable to general workplace bureaucracy or administrative processing. Carmona-Rivera, 464 F.3d at 20. At most, Colón asserts that she was the only employee who suffered such delays. In testimony, however, Colón conceded that other co-workers also had checks withheld for at

least a week's period, thus weakening any alleged retaliatory intent.

Second, Colón offers no evidence linking the withheld 2007 payments to her 2006 parking spot request. Randlett, 118 F.3d at 862 ("To make out a retaliation claim requires not only an adverse employment action and previously protected conduct, but also a colorable showing that 'a causal connection existed between the protected conduct and the adverse action.'" (quoting Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996))). The most she offers is the unsupported assertion that in all years prior to her 2006 parking spot request, she never went several pay periods without payment, whereas months after her accommodation request, she did.

The record shows the Municipality customarily docked her pay, or sent letters indicating a reduction in a subsequent paycheck, well before Colón's 2006 parking request. Furthermore, the contested withheld payments date from summer 2007, well over seven months after Colón's accommodation request; this is insufficient for purposes of establishing causality. See Calero-Cerezo, 355 F.3d at 25 (noting that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

Because there is no evidence in the record from which a reasonable factfinder could conclude the alleged payment delays

-43-

resulted from either intentional discrimination or retaliatory behavior, Colón's claim as to this alleged retaliatory act fails.

### 3. Changes in Colón's Work Schedule

Colón claims that on February 1, 2007 she sent a request to Rodríguez to make a change in her work schedule so that Colón could attend medical appointments; because Rodríguez never answered Colón's request, she lost the balance of her sick/vacation leaves, which constituted a retaliatory act for Colón's 2006 parking spot request. We find no merit to Colón's argument.

Colón testified that she never followed up with Rodríguez following her initial submission of the work change request. Specifically, the testimony provided:

> Q: Okay. Then you also told me and correct me if I'm wrong, that you never did that, you never followed up. You sent an electronic mail and did not give any follow up of any kind?
>
> A: Well, I didn't follow up . . . .

App. at 287.

This evidence, that Rodríguez simply never responded to what likely was one of numerous emails received over the course of a month in her supervisory position (and indeed, what has proved to be one of Colón's various requests for accommodation) is not sufficient for purposes of establishing a causal connection to her parking spot request. See Kosereis v. Rhode Island, 331 F.3d 207, 217 (1st Cir. 2003) (affirming district court's grant of summary

-44-

judgment on plaintiff's retaliation claim where plaintiff failed to show causal connection between the protected conduct and alleged retaliatory act).

It also is not sufficient to show retaliatory intent, particularly where the evidence shows that, outside of this isolated incident, the Municipality made repeated efforts to accommodate Colón's absences due to her health over the course of nearly two decades. Carmona-Rivera, 464 F.3d at 20; Soileau, 105 F.3d at 17 ("Evidence that an employer willingly granted an employee's request for an accommodation . . . militate[s] against making an inference of retaliation . . . .").

Lastly, Colón admitted in her deposition that the Municipality subsequently approved a change in her work schedule in March 2008, permitting her to attend her medical appointments without affecting her leave balance. Thus, the record does not show Colón materially suffered on account of her accommodation request. Colón's failure to proffer evidence showing significant harm or retaliatory intent is detrimental to her claim that Rodríguez's failure to respond constituted retaliation.

### 4. Delayed Approval of Outlook Computer Training

Colón argues that Rodríguez's delayed approval of her request to participate in a computer training workshop constituted an adverse employment action. Colón fails to show how any delay

was intentional, material, or causally connected to her request for a parking spot.

Colón testified that she submitted her request for the September 11, 2007 training on August 23, 2007, but that she never followed up with Rodríguez as to the status of her request. Although Colón stated that she believed any follow-up with Rodríguez would have been futile because Rodríguez refused to meet with her, we do not see any evidence indicating intentional delay. See Carmona-Rivera, 404 F.3d at 20 (finding that district court properly granted summary judgment on retaliation claim because plaintiff "failed to provide any evidence of a retaliatory intent associated with the delay in implementing her requests, or any evidence which shows that the delay was anything beyond that inherent in the workings of [plaintiff's workplace] bureaucracy").

Even construing the record in Colón's favor as to intentional delay, her claim still fails. To establish an adverse employment action, Colón must show she suffered material harm due to the delay. See id. The most that Colón alleges is that the lack of computer training would "affect[] her progress and evolution as a professional." This conclusory allegation is not sufficient for purposes of establishing a "significant, not trivial, harm" that rises above mere "inconvenience." Id.; Ingram v. Brink's, Inc., 414 F.3d 222, 229 (1st Cir. 2005) (stating that

"summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation").

Additionally, even if we were to determine that Colón showed material harm, she still bears the burden of showing that the alleged adverse action, the approval delay, was "taken for the purpose of retaliating." Randlett, 118 F.3d at 862 (emphasis in original). Colón points us to no evidence showing that Rodríguez delayed her September 2007 approval of Colón's participation in the workshop because of Colón's October 2006 request for a parking spot, nearly a year after the contested reasonable accommodation. The alleged approval delay occurred approximately eleven months following Colón's reasonable accommodation request; this is not sufficient to establish causality between the two events. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).

### 5. Negative Memorandum Against Colón

Colón contends the district court failed to properly consider her next alleged retaliatory act, a requested disciplinary memorandum. In a sworn statement, Colón's co-worker Ruth Carmona stated that Rodríguez asked "for my advise [sic] in order to issue a disciplinary memo against Nitza Colón but I refused." The district court noted that Carmona's sworn statement was undated. Colón-Fontánez, 671 F. Supp. 2d at 333. It further noted a lack of specificity in Carmona's testimony as to when Rodríguez allegedly requested the disciplinary memorandum of Carmona. Id.

-47-

Colón asserts that specificity, at least as to Rodríguez's alleged instruction, was established from Carmona's statement that the work environment towards Colón became hostile "[a]fter Nitza Colón requested a reasonable accommodation," and that "[i]n [sic] one occasion, the Director asked me" to issue a disciplinary memorandum. We agree with the district court that these broadly phrased time estimates are far too general for purposes of determining when the alleged adverse employment action occurred.

Moreover, even if we were to determine that causality is met because the alleged memorandum request occurred close in time to Colón's accommodation request, see Wyatt, 35 F.3d at 16, Colón offers no evidence showing that she suffered material harm from Rodríguez's instruction. See Burlington Northern, 548 U.S. at 68. Indeed, the record indicates otherwise as no disciplinary memorandum ever was issued.

### 6. Elimination of Supervisory Duties

Colón asserts that Rodríguez retaliated against her when Rodríguez removed Colón's assistant, Yesiree Alemán, from Colón's supervision, effectively eliminating her supervisory duties. The record shows that Alemán was assigned to the Auction Department in 2001, with Julia Lanzó acting as her immediate supervisor. In 2004, Rodríguez and Lanzó assigned Alemán to be Colón's assistant due to her precarious health condition. Though the specific date

of Alemán's transfer from being -- in Alemán's words -- Colón's "direct[] and exclusive[]" assistant to an assistant for "anyone else [including Colón] who needed me in the [department]" is not clear from the record, both Colón and Alemán's testimony agree that the transfer occurred sometime in 2007 after Colón's request for a parking spot.

Construing the record in Colón's favor, we presume she can establish temporal proximity as to the alleged elimination of her duties and her 2006 parking space request. We therefore focus our analysis on whether Colón can show the alleged adverse action constituted material harm.

Case law acknowledges that a change in an employee's responsibilities may be sufficient to establish an adverse employment action. See Blackie, 75 F.3d at 725 (noting a discharge, demotion, reduction in salary, divestiture of significant responsibilities, or withholding of recognition may be sufficient to constitute a materially adverse employment action); see also Connell v. Bank of Boston, 924 F.2d 1169, 1179 (1st Cir. 1991) (stating a "discharge, demotion, or failure to promote" may adversely affect an employee). This is not the case here.

Colón offers no evidence showing the alleged "elimination" of her supervisory position rose to the level of material harm. First, Colón's testimony casts doubt upon the supervisory nature of her alleged managerial position. Colón

testified that, although Alemán was her assistant, Colón was not responsible for evaluating Alemán's performance; rather, evaluations "were always done by the manager or the director."

Further, the evidence shows that Colón received Alemán as her assistant on account of her unpredictable yet recurring absences, not because of any promotion in employee status, raise in salary, or change in job title. Specifically, both Lanzó and Alemán testified during deposition that Alemán was assigned to Colón to ensure there would be no disruption of duties and to assure that Colón's work would be managed in her absence. Further, upon the alleged elimination of supervisory duties, Colón suffered no demotion, salary reduction, position reclassification, or loss of rank or prominence in her department.

Although Colón generally argues she "suffered the lost [sic] of respect from her co-workers" and an exacerbation of her health condition from the elimination of her alleged supervisory duties, Colón's argument misses the mark. Because Colón failed to proffer facts showing how Alemán's re-assignment significantly affected her alleged prior authority, we fail to see how the transfer constituted a materially adverse action. See Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 50 (1st Cir. 1999) (noting case law holding that divesting an employee of significant assignments or substantial responsibilities may be sufficient to constitute an adverse employment action). As the district court

noted, the Municipality's assignment of Alemán to Colón sounds like more of an accommodation than a retaliation, and an employer's act of accommodation generally "tends to militate against making an inference of retaliation." Soileau, 105 F.3d at 17.

### 7. Reassignment of Colón's Duties in the Women's Affairs Department

Colón asserts as her next retaliatory act Rodríguez's alleged elimination of her work duties for the Department of Women's Affairs.[19] Alemán testified that in 2007 Rodríguez held a personnel meeting in which it was declared that Colón would no longer be in charge of the Department for Women's Integral Development, and that her work would be reassigned to someone else in the department. In a sworn statement, Rodríguez asserted, first, that she regularly did reassignments in the Auction Department "to get things moving. These reassignments are done from time to time, in order to meet manpower gaps that the Auction Department has." Rodríguez noted that the purpose of such reassignments was to "prevent backlogs" and ensure that all matters remained current, although she also acknowledged that the Department of Women's Affairs "seldom" required attention. Second, Rodríguez stated that her reassignment of Colón's work in this department was not on account of her health condition; rather, it

_____

[19] The record refers to this same department as the Department of Women's Affairs, the Women's Affair Department, and the Department of Integral Development of Women. We likewise use these names interchangeably.

-51-

was "to assist Nitza Colón in meeting her work levels requirements . . . [and] to give Nitza Colón breathing space so that she could otherwise manage her absenteeism situation."

Colón's argument as to reassignment parallels her argument as to the alleged elimination of her supervisory duties, i.e., Rodríguez eliminated certain work responsibilities of Colón's following her accommodation request and this constituted retaliation. Colón's argument holds little water. Colón herself in testimony estimated that the alleged reassignment of her departmental duties occurred in November 2007, approximately one year after her parking space request. As previously set forth, a near twelve month passage of time between the asserted protected conduct and alleged adverse action weighs against a finding of causality. See Calero-Cerezo, 355 F.3d at 25 (stating that three and four month periods have been held insufficient for purposes of establishing causality based on temporal proximity).

Moreover, even assuming causality can be established, Colón articulates no facts showing how the alleged reassignment caused her significant harm or substantially altered her job responsibilities. See Blackie, 75 F.3d at 725-26; Simas, 170 F.3d at 50. Indeed, even though Colón acknowledges Rodríguez's assertion that the Department of Women's Affairs "rarely produces work for the Auction Department [and it] does [not] require significant attention," Colón does not counter it. This weighs

against a finding that any loss or reassignment of duties in this area caused Colón significant harm or materially altered her job responsibilities.[20]

## E.   Hostile Work Environment Claim

In addition to her various alleged acts of retaliation, Colón also asserts that the Municipality retaliated against her by subjecting her to a hostile work environment.  To establish a hostile work environment, a plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [his] employment and create an abusive working environment."  Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (alterations in original) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)) (internal quotation mark omitted).

Assessing whether the work environment is hostile or abusive "must be answered by reference to 'all the circumstances.'" Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002) (quoting Harris, 510 U.S. at 23).   While "'[t]here is no

---

[20]   Though not raised on appeal, the record shows that Colón initially argued as an act of retaliation her supervisor's refusal to evaluate her following her reasonable accommodation request, thereby preventing her from advancing in her employment. See Opp'n Mot. to Summ. J. at 26.  Because we generally are not required to consider arguments that are not raised on appeal, we do not address the merits of this previously alleged retaliatory act. See Negrón-Fuentes v. UPS Supply Chain Solutions, 532 F.3d 1, 9 (1st Cir. 2008) (declining to consider argument that was raised in the district court but "not pressed" on appeal); Kandamar v. Gonzáles, 464 F.3d 65, 72 n.3 (1st Cir. 2006) (same).

mathematically precise test to determine whether [a plaintiff] presented sufficient evidence' that she was subjected to a severely or pervasively hostile work environment," Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (second alteration in original) (quoting Kosereis, 331 F.3d at 216), courts have recognized the following factors, among others, as relevant: the severity of the conduct; its frequency; and whether it unreasonably interfered with the victim's work performance. Id.; see also Ríos-Jiménez, 520 F.3d at 43. We note that our role is "to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).

Case law is clear that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" to establish an objectively hostile or abusive work environment. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation omitted) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82) (1998)). Colón's allegations do not rise to the level of severity or pervasiveness that we have recognized as indicative of a hostile or abusive work environment.

For instance, Colón alleges that when she would stop by Rodríguez's office, Rodríguez would refuse to meet with her in violation of her supervisory duties. Although Rodríguez permitted

other employees to come and go from her office, Rodríguez avoided Colón, required Colón to wait, restricted Colón's access to her, and refused to amicably greet her in general encounters. On one occasion, Rodríguez threw Colón and a co-worker out of her office, yelling at them in front of other Municipality employees. Rodríguez then permitted the witnessing employees to enter her office without yelling at them. Rodríguez ordered Colón's assistant, Yesiree Alemán, to return to her desk whenever she tried to discuss cases or prepare reports with Colón. Rodríguez failed to take action against various employees who made comments against Colón. When Colón asked Rodríguez to hold a meeting with her fellow co-workers to discuss their derogatory comments towards her, Rodríguez refused the request. Colón's general movements throughout the office were limited; if she left her desk to go to the bathroom, Colón's supervisor, or someone designated by her, would follow her. In 2008, when other co-workers were invited to participate in a contracts workshop, Colón was not allowed to participate, even though Colón previously had engaged in such activities.

While these facts certainly indicate an uncomfortable and tense working relationship between Colón and Rodríguez, again, they are not sufficiently severe or pervasive to constitute a hostile work environment. See generally Rosario v. Dep't of the Army, 607

F.3d 241 (1st Cir. 2010); <u>Marrero</u>, 304 F.3d 7; <u>O'Rourke</u> v. <u>City of Providence</u>, 235 F.3d 713 (1st Cir. 2001).

Furthermore, although Rodríguez's interactions with Colón may be described as brusque and even uncivil, we note that "a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws." <u>Lee-Crespo</u> v. <u>Schering-Plough Del Caribe, Inc.</u>, 354 F.3d 34, 46-47 (1st Cir. 2003). Even construing the facts in Colón's favor, as we are required to do, the evidence does not support a hostile work environment claim. The incidents described are episodic, but not frequent, in nature; upsetting, but not severe; mildly humiliating, but not physically threatening. <u>Id.</u> at 46. Lastly, such acts do not appear to have affected her overall work performance; in fact Colón, both below and on appeal, repeatedly has asserted to the contrary. See <u>id.</u>

Colón additionally points to the following evidence as indicative of a hostile work environment: co-workers told Colón on several occasions to get on social security or apply for disability so that she could receive an assured check; called her a hypochondriac; claimed she was "faking it;" or generally isolated her from general workplace interactions. Again, while not questioning the discomfort such workplace interactions produce, these allegations are not sufficient for establishing an objectively hostile and abusive work environment. See <u>Suárez</u> v.

Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins . . . to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world.").[21]

Because the alleged acts of retaliation here do not rise to the level of severity or pervasiveness that a reasonable employee would find to have materially altered the conditions of her employment such that an abusive work environment was created, we affirm the district court's grant of summary judgment as to a hostile work environment claim.

## F.    District Court's <u>Sua Sponte</u> Dismissal of Colón's Equal Protection Claim

Colón's remaining argument on appeal is that the district court improperly dismissed her equal protection claim <u>sua sponte</u> because the Municipality never moved for its dismissal in its motion for summary judgment.  We begin with Colón's alleged "claim."

The only reference to an equal protection claim that we can find in the record is in the jurisdiction section to Colón's amended complaint, in which she asserts: "Also, the equal protection clause of the U.S. Constitution is proclaimed."  Colón does not include the claim as a separate cause of action in the

_____

[21] Although Colón asserted additional acts below in support of her hostile work environment claim, she did not raise such acts on appeal, and we therefore do not address them.  <u>See</u> <u>Negrón-Fuentes</u>, 532 F.3d at 9; <u>Kandamar</u>, 464 F.3d at 72 n.3.

complaint; she does not incorporate it into her other causes of action; she makes no factual or legal argument in support of this claim in her amended complaint or other subsequent pleading (or even on this appeal); and she makes no reference to it in her opposition to summary judgment motion. See Ruiz-Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 87-88 (1st Cir. 2008) (finding no error where district court did not review a "fleeting and inadequate" claim that plaintiff only raised in her complaint's introductory paragraph, which she did not raise as a separate cause of action, and to which she pled no supporting facts).

In short, Colón makes a one-sentence, legally and factually unsupported, emaciated assertion of an equal protection claim to secure the district court's federal jurisdiction over her case. We have warned parties before that trial judges are not "mind readers," and that "[i]f claims are merely insinuated rather than actually articulated," courts are not required to make determinations on them. McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991); see also Harriman v. Hancock Cnty., 627 F.3d 22, 28 (1st Cir. 2010) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1998) (a party has a duty

"to spell out its arguments squarely and distinctly . . . [instead of being] allowed to defeat the system by seeding the record with mysterious references to unpled claims").

Moreover, even if Colón's one sentence claim, bereft of any legal citation or factual analysis, could be deemed to have required notice of its potential exposure to the winds of dismissal for failure to state a justiciable claim -- further notice, of course, aside from Colón having already sought to amend her complaint and having fully responded to the Municipality's summary judgment motion (which sought to effectively remove all of her listed causes of action from the court's consideration, leaving as her only potential "claim" on which to prop herself before the federal court's jurisdiction her alleged equal protection claim) -- "not . . . every sua sponte dismissal entered without prior notice to the plaintiff automatically must be reversed." González-González v. United States, 257 F.3d 31, 37 (1st Cir. 2001). "If it is crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile, then a sua sponte dismissal may stand." Id.

Here, the record shows that Colón already was afforded the opportunity to amend her complaint, into which she planted the seed of an equal protection claim. But she buried and abandoned the seed in the complaint's jurisdiction section, failing to support it with factual or legal arguments, or to even address it

again -- whether in that pleading or in any other pleading, motion, or brief.  Thus, we cannot see how a subsequent opportunity to amend would be anything but futile.  Colón cannot reap what she has not sown.

Further, any remand here is unnecessary because Colón's claim "clearly fail[s] to survive the proper Rule 8(a)(2) notice pleading standard." Cepero-Rivera v. Fagundo, 414 F.3d 124, 129 (1st Cir. 2005).  Rule 8(a)(2) requires that a pleading stating a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2); however, there must be "sufficient detail in the complaint to give a defendant fair notice of the claim and the grounds upon which it rests." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 8 (1st Cir. 2011).  That is, the plain statement must "possess enough heft to show that the pleader is entitled to relief," id., and it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Sánchez v. Pereira-Castillo, 590 F.3d 31, 48 (1st Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)) (internal quotation marks omitted).  Colón's claim here lacks any legal or factual authority or supportive detail.  She cannot bury a blatantly inadequately pled claim in her complaint on the hope that it might spring to life like a forgotten Hydra-head upon the court's disposal of all of her other alleged claims.  We therefore find no error in the

district court's determination not to consider Colón's entirely unarticulated equal protection claim.  <u>See</u> <u>Ruiz-Rivera</u>, 521 F.3d at 87-88.

### III.  <u>Conclusion</u>

For the reasons stated, we affirm the district court's grant of summary judgment.

**<u>Affirmed</u>**.